***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris, and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Harris, with minor modifications.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner, and in the Pre-Trial Agreement, as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act, and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter.
2. An employee-employer relationship existed between Plaintiff and Defendant-Employer.
3. Defendant-Employer is self-insured.
4. There is no issue as to misjoinder or nonjoinder of parties.
5. Plaintiff's average weekly wage in this claim is $510.14.
 *********** EXHIBITS
The following documents were accepted into evidence as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Industrial Commission Forms
 • Exhibit 3: Plaintiff's interrogatory responses
 • Exhibit 4: Company nurse notes
 • Exhibit 5: Plaintiff's medical records
The following documents were accepted into evidence as Plaintiff's Exhibits:
 • Exhibit 1: Transcript of Plaintiff's recorded statement
 • Exhibit 2: Plaintiff's personnel file
 • Exhibit 3: Job search documentation
 • Exhibit 5: Medical records
 • Exhibit 6: Incident report
The following documents were accepted into evidence as Defendants' Exhibits:
 • Exhibit 1: MySpace printout
 • Exhibit 2: Facebook printout
 • Exhibit 3: Criminal record search
Transcripts of the depositions of the following were also received into evidence following the hearing before the Deputy Commissioner:
 • Phillip Andrew Killian, P.A. (with Exhibit 1)
 • Dr. Stephen Sladicka (with Exhibit 1 and Plaintiff's Exhibits 1 2)
 • Dr. Ralph Maxy (with Exhibit 1)
 *********** ISSUES
1. Whether Plaintiff sustained a compensable back injury by specific traumatic incident on July 24, 2009?
2. If so, to what compensation, if any, is Plaintiff entitled?
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 28 years old, with a date of birth of September 3, 1982.
2. Plaintiff began working at Defendant-Employer's warehouse in Newton, North Carolina on May 29, 2009. Plaintiff's job involved handling and selecting inventory stored in the warehouse. Plaintiff sometimes drove a forklift. Prior to the date of injury in this claim, he was able to lift 40 to 75 pounds by himself.
3. Plaintiff had no serious back problems prior to the date of injury in this claim. Shortly before he began his employment with Defendant-Employer, Plaintiff successfully completed an extensive pre-employment physical examination which included lifting 85 pounds.
4. At approximately 6:00 a.m. on Friday, July 24, 2009, Plaintiff led a number of other warehouse employees in a warm-up regimen of stretching and other exercises. Plaintiff did not experience any problems in performing the exercises.
5. At approximately 8:00 a.m. the same day, Plaintiff picked up a heavy box containing a disassembled book shelf in order to place it on top of a stack of boxes which were approximately six feet high. The box weighed between 49 and 70 pounds, and its dimensions were approximately 55" x 33" x 2.38". As Plaintiff lifted the box and twisted to place it on the stack, he felt and heard a pop in his mid-back between his shoulder blades, and experienced sudden severe pain in his neck and mid-back with some numbness into both shoulders and elbows. As the day progressed, Plaintiff also experienced pain in his low back.
6. Immediately following the incident, Plaintiff looked for his supervisor, Ron Watson, in order to report the incident. When Plaintiff was unsuccessful in locating Mr. Watson, he reported the incident to Louis Windsor, an on-site trainer, who told Plaintiff to see the plant nurse.
7. In accordance with Mr. Windsor's instructions, Plaintiff went to the company nurse, Amy Ford, and reported his injury to her. Ms. Ford's records show that Plaintiff reported that he was lifting a box and felt a pull/strain in his right lower neck. Ms. Ford applied BioFreeze, an analgesic cream, to Plaintiff's back, and gave him over-the-counter pain medication. She advised Plaintiff to return to see her around noon if he was not feeling better.
8. Ms. Ford testified that Plaintiff told her that his neck had been stiff upon waking up that morning, although she did not note this in her record. Charlotte Green, an upper level manager for Defendant-Employer, also testified that Plaintiff told her at approximately 7:00 a.m. on the morning of July 24, 2009 that he had slept on his neck wrong the night before and had a crick in it. Plaintiff testified that his comment to Ms. Ford about sleeping on his neck wrong was intended to be an analogy used to describe the pain that he was feeling. To the extent that Ms. Ford's and Ms. Green's testimony contradicts Plaintiff's, the Full Commission finds Plaintiff's testimony to be more credible on this point.
9. After seeing Ms. Ford, Plaintiff went back out on the warehouse floor and performed light tasks.
10. Defendant-Employer terminated Plaintiff's employment around noon on July 24, 2009. Defendants allege that Plaintiff was terminated for "cherry-picking", which they describe as handling new inventory before old inventory. Defendants also allege that the "cherry-picking" happened early in the morning on July 24, 2009, before the occurrence of Plaintiff's injury, and that Plaintiff's supervisor, Mr. Watson, informed Plaintiff that he was being considered for termination for "cherry-picking" before Plaintiff was injured.
11. Mr. Watson was the only member of management with first-hand knowledge of Plaintiff's alleged "cherry-picking." Mr. Watson was also integrally involved in the termination process, however, he did not testify at the hearing before the Deputy Commissioner. Ms. Green and Laura Mullen, two managers who were above Mr. Watson in the chain of command, and Lamija Alagic, a human resources representative, testified about the alleged circumstances of Plaintiff's termination. Ms. Green confirmed that all of her knowledge about the alleged "cherry-picking" came from Mr. Watson, that she never observed Plaintiff "cherry-picking," and that the decision to terminate Plaintiff was made based entirely upon statements by Mr. Watson. Ms. Mullen also confirmed that all of her knowledge on this point came from Mr. Watson, and that she never observed Plaintiff "cherry-picking." Ms. Alagic testified that Ms. Mullen and Mr. Watson came to her for assistance with the termination, and that she did not have any direct knowledge of the circumstances surrounding the termination.
12. Plaintiff returned to Ms. Ford before leaving the warehouse on July 24, 2009, and Ms. Ford again applied BioFreeze to his back.
13. Mr. Watson completed a cursory written report regarding Plaintiff's injury, although Defendants did not produce it until after the hearing before the Deputy Commissioner, when it became apparent through testimony that it existed. The report, which was dated July 24, 2009, contained Mr. Watson's name, but did not include the time of the injury or the time of the report.
14. After Plaintiff's termination, his fiancée came to the warehouse and drove him home. Later on the evening of July 24, 2009, with his symptoms worsening, Plaintiff went to the emergency room at Catawba Valley Medical Center. After an extended wait, he was seen at approximately 8:25 p.m. and complained of neck pain, thoracic pain and lumbar pain. Separate x-rays were taken of his cervical, thoracic and lumbar spine. Plaintiff was given muscle relaxers and pain medications.
15. Plaintiff's fiancée contacted Defendant-Employer the next day to request that they provide Plaintiff with medical treatment. Defendant-Employer sent Plaintiff to the Occupational Health Center at Catawba Valley Medical Center where Plaintiff began treating with physician's assistant Phillip Killian.
16. On July 28, 2009, Mr. Killian noted that Plaintiff was tender upon examination over his lower cervical area into his thoracic spine, and that he was also tender in his lower thoracic spine down through his lumbar spine and into the sacral area. Mr. Killian diagnosed Plaintiff with acute cervical, thoracic and lumbar strain. He felt that his physical examination of Plaintiff was consistent with Plaintiff's pain complaints, and that there were no signs of symptom exaggeration.
17. Also on July 28, 2009, Mr. Killian assigned work restrictions to Plaintiff of no lifting over five pounds and no prolonged bending, twisting or turning of the neck or back.
18. Approximately one to two weeks after his July 24, 2009 injury, Plaintiff developed numbness in both of his legs.
19. Plaintiff returned to Mr. Killian on August 4, 2009, on which date Plaintiff complained of continued thoracic pain, which seemed to be worse on the right side than on the left. Plaintiff also reported that he had pain radiating into his hips and legs.
20. Plaintiff again followed up with Mr. Killian on August 14, 2009. On that date, Plaintiff continued to complain of severe pain in his neck and thoracic region and down into his low back. The physical examination yielded the same findings as the two prior visits, including pain on palpation starting at the mid-point of the scapula and going down the thoracic spine into the lumbar area. Mr. Killian opined that he would have expected strains to have improved by this time, and he was concerned that Plaintiff's condition might be more serious than a strain. As such, he recommended that Plaintiff see an orthopedist.
21. Plaintiff again followed up with Mr. Killian on August 24, 2009. On this visit, Mr. Killian noted, "The development of these injuries were in question over at Target." When Plaintiff continued to complain of significant pain in his thoracic and lumbar spine, Mr. Killian began to question the validity of Plaintiff's complaints. His diagnosis remained acute cervical, thoracic and lumbar strain, "reportedly from a work injury a month ago with no improvement." Mr. Killian increased Plaintiff's lifting limitation to ten pounds and kept him on medications.
22. Defendants filed a Form 63 conditionally accepting this claim on August 27, 2009. While Defendants provided Plaintiff with medical treatment, they did not pay him any indemnity compensation.
23. Plaintiff last saw Mr. Killian on September 4, 2009. At this appointment, Mr. Killian noted, "He is still having this tightness in his thoracic spine and a knot that is present between his right scapula and his spine."
24. Upon Mr. Killian's referral, Defendants sent Plaintiff to Dr. Sladicka, an orthopedist with Carolina Orthopaedic Specialists.
25. Plaintiff presented to Dr. Sladicka on September 10, 2009. Plaintiff complained of intermittent numbness and weakness in his arms and legs, and indicated that his whole spine was hurting. Dr. Sladicka thought that Plaintiff displayed Waddell signs with light touch to his back, but he clarified that this finding might indicate a psychological overlay to Plaintiff's symptoms, and he did not think that Plaintiff had motives of secondary gain. Dr. Sladicka diagnosed cervical, thoracic and lumbar back pain and recommended that Plaintiff try physical therapy. Dr. Sladicka also assigned restrictions of a sitting job for four hours with hourly breaks and intermittent standing, and no lifting greater than one pound.
26. Plaintiff returned to Dr. Sladicka on October 1, 2009, at which time he reported that his condition had not improved, and that after two sessions, physical therapy was not helping. Dr. Sladicka recommended MRIs for all three regions of Plaintiff's back.
27. On October 22, 2009, exactly 90 days after Defendant-Employer had actual knowledge of Plaintiff's accident and injury, Defendants filed a Form 61 denying Plaintiff's claim.
28. Plaintiff returned to Dr. Sladicka on November 5, 2009, after undergoing the MRIs recommended by Dr. Sladicka. Dr. Sladicka noted that the thoracic MRI showed a disk herniation at T9-10 on the right pushing on the anterior aspect of the spinal cord. Dr. Sladicka kept Plaintiff on a five pound lifting restriction, and referred him to a spine specialist at Carolina Orthopaedic Specialists.
29. Dr. Sladicka opined to a reasonable degree of medical certainty, and the Full Commission finds, that the July 24, 2009 box-lifting incident was a substantial causative factor in the back condition that he observed in Plaintiff. Dr. Sladicka never felt that Plaintiff was malingering.
30. On February 26, 2010, following the hearing before the Deputy Commissioner, Plaintiff saw Dr. Maxy, an orthopedic surgeon specializing in spinal surgery at Carolina Orthopaedic Specialists, for a one-time evaluation pursuant to Deputy Commissioner Harris' Order. Dr. Maxy opined that the mechanism of Plaintiff's July 24, 2009 box-lifting injury was consistent with a thoracic disk herniation, and that said injury was more likely than not the cause of Plaintiff's T9-10 disk herniation. Dr. Maxy further opined that Plaintiff probably also sustained a cervical strain as a result of the injury, and that a cervical strain can be a serious, long-term condition. Dr. Maxy also opined that the nerves pinched from a mid-back condition such as Plaintiff's travel down into the low back and legs, and can account for symptoms from the low back all the way down to the feet.
31. Later in his deposition, on cross examination, Dr. Maxy changed his testimony to say that it was only "possible" that Plaintiff's July 24, 2009 injury caused his T9-10 disk herniation. Dr. Maxy changed his testimony based solely upon a cursory and limited review of the records of Plaintiff's medical treatment prior to presenting to Dr. Maxy. Dr. Maxy interpreted Dr. Sladicka's mention of Waddell signs as evidence of malingering, stating "we all understand what that means when a patient shows Waddell signs." Based upon his limited review of the records, Dr. Maxy questioned whether Plaintiff's symptoms were real. However, as set forth above, Dr. Sladicka himself did not intend for his notation regarding Waddell signs to be interpreted as malingering on the part of Plaintiff.
32. Dr. Maxy did not go off the record in his deposition to review the prior medical records. Rather, he reviewed selected records within the context of questions from counsel focusing on portions of said records.
33. Also, based on his limited review, Dr. Maxy expressed a concern that Plaintiff's prior medical records described symptoms over his entire spine, were not specific to the thoracic region, and seemed to change between office visits in ways that he opined did not seem consistent. Dr. Maxy noted that it did not seem that Plaintiff had reported any symptoms related to the T9-10 disk herniation until three or four weeks after the July 24, 2009 incident.
34. Based upon a thorough review of all of Plaintiff's medical records, the Full Commission finds that Plaintiff did indeed express thoracic symptoms early on in his treatment, including during his July 24, 2009 emergency room visit, and his July 28, 2009 and August 4, 2009 visits with Mr. Killian.
35. The Full Commission accords more weight to Dr. Maxy's causation testimony on direct examination that Plaintiff's T9-10 disk herniation is more likely than not related to his July 24, 2009 lifting injury, than to his later testimony on cross examination, which the Full Commission finds was based solely upon a cursory and limited review of Plaintiff's prior medical records.
36. Dr. Maxy confirmed that, even after his limited medical record review, he felt it was highly likely that Plaintiff sustained a cervical strain in the July 24, 2009 incident.
37. Dr. Maxy would keep Plaintiff on work restrictions of no lifting over ten pounds and no repetitive bending, twisting or stooping.
38. Dr. Maxy opined, and the Full Commission finds based upon the greater weight of the evidence, that Plaintiff needs further medical treatment for his T9-10 disk herniation, including but not limited to epidural steroid injections and possibly surgery. Further medical treatment for Plaintiff's cervical and thoracic conditions is reasonably required to effect a cure, provide relief and/or lessen the period of Plaintiff's disability.
39. Ms. Alagic, Defendant-Employer's human resources representative, gave vague and conclusory testimony to the effect that Defendant-Employer had a "policy" of accommodating work restrictions and that Defendant-Employer "absolutely" would have accommodated Plaintiff's restrictions relating to his July 24, 2009 injury had he not been terminated. She did not testify as to any actual positions that would have been available to an injured warehouse worker with Plaintiff's restrictions. Ms. Alagic confirmed that Defendant-Employer did not offer Plaintiff any light-duty employment after learning of Plaintiff's work restrictions.
40. Shortly after his termination by Defendant-Employer, Plaintiff initiated a reasonably diligent job search. He looked for work both in-person and on the internet, and provided a list of 22 specific positions that he sought with specific employers on specific dates between July 29, 2009 and October 8, 2009.
41. Plaintiff had no income from July 24, 2009 through October 15, 2009.
42. Plaintiff started a new job with Draka making fiber optic cables on October 15, 2009. This job involved lifting no greater than two to three pounds, and was within the work restrictions imposed by Dr. Sladicka. Plaintiff was allowed to sit in this job. He made $10.00 per hour and worked an average of 40 hours per week, with the result that he was paid less in this job that he was paid in his job with Defendant-Employer.
43. Plaintiff continues to look for better-paying work.
44. Plaintiff continues to have significant pain in his neck, mid-back and low back, with the worst pain occurring in his mid-back. Plaintiff also has intermittent numbness in his arms and numbness on the outside of both of his legs from his hips to his toes.
45. The Full Commission finds Plaintiff's testimony regarding the history of his July 24, 2009 injury and his symptoms thereafter to be credible.
46. Plaintiff's average weekly wage of $510.14 yields a compensation rate of $340.11.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On July 24, 2009, Plaintiff sustained a compensable injury by accident to his neck and back, in the form of a cervical strain and a T9-10 disk herniation, arising out of and in the course of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff was totally disabled from July 25, 2009 through and including October 14, 2009, in that he was under significant activity restrictions related to his compensable injuries during said period, and he engaged in a reasonable job search. N.C. Gen. Stat. § 97-2(9); Russell v. Lowes ProductionDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
3. Plaintiff was partially disabled from October 15, 2009 forward, in that he found employment within his restrictions at a lesser wage than he earned prior to sustaining his compensable injuries. N.C. Gen. Stat. § 97-30.
4. Regardless of when Defendant-Employer actually decided to terminate Plaintiff's employment, Defendants have not carried their burden to show either that Plaintiff's termination was unrelated to his compensable injuries, or that Defendant-Employer would have had suitable employment within Plaintiff's work restrictions available to him but for his termination. As such, Defendants have not shown that Plaintiff constructively refused suitable employment and are not entitled to avoid payment of indemnity compensation on those grounds. N.C. Gen. Stat. § 97-32; Seagraves v. Austin Co. ofGreensboro, 123 N.C. App. 228, 472 S.E.2d 397 (1996).
5. Plaintiff is entitled to temporary total disability compensation in the amount of $340.11 per week for the period from July 25, 2009 through October 14, 2009. N.C. Gen. Stat. § 97-29.
6. Plaintiff is entitled to temporary partial disability compensation, as calculated per N.C. Gen. Stat. § 97-30, for the weeks following October 15, 2009 during which he has earned less than his pre-injury average weekly wage.
7. Plaintiff is entitled to have Defendants pay for the medical treatment that he has heretofore received for his compensable back conditions, including but not limited to diagnostic studies and imaging, prescriptions, physical therapy and mileage. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
8. Plaintiff is entitled to have Defendants authorize and pay for further medical treatment for his compensable back conditions with and/or at the direction of Dr. Maxy, including but not limited to diagnostic studies and imaging, injections, surgeries, prescriptions, physical therapy, referrals and mileage. Id.
 ***********
Based upon the foregoing Findings of Facts and Conclusions of Law, the Full Commission enters the following:
 A W A R D
1. Subject to the attorney's fee provision below, Defendants shall pay to Plaintiff, in a lump sum, back temporary total disability compensation in the amount of $340.11 per week from July 25, 2009 through October 14, 2009.
2. Also subject to the attorney's fee provision below, Defendants shall pay to Plaintiff, in a lump sum, back temporary partial disability compensation as figured per N.C. Gen. Stat. § 97-30, for the period from October 15, 2009 through the present. Defendants shall continue to pay temporary partial disability compensation to Plaintiff as appropriate until 300 weeks from July 24, 2009 or further Order of the Industrial Commission, whichever comes first.
3. As Plaintiff's attorney's fee, Defendants shall deduct 25 percent of the lump sum amounts set forth in Paragraphs 1 and 2 above and pay such portion directly to Plaintiff's counsel. Defendants shall also make 25 percent of any and all ongoing temporary partial disability payments payable directly to Plaintiff's counsel.
4. To the extent they have not already done so, Defendants shall pay for the medical treatment that Plaintiff has heretofore received for his compensable back conditions, including but not limited to diagnostic studies and imaging, prescriptions, physical therapy and mileage. To the extent that Plaintiff and/or any third party payor(s) have paid for any such treatment, Defendants shall reimburse such payor(s) when bills for the same have been submitted in accordance with Industrial Commission procedures.
5. Dr. Maxy is hereby designated as Plaintiff's treating physician for his compensable back conditions, and Defendants shall authorize and pay for such further treatment that Dr. Maxy recommends, including but not limited to diagnostic studies and imaging, injections, surgeries, prescriptions, physical therapy, referrals and mileage when bills for the same have been submitted in accordance with Industrial Commission procedures.
6. Defendants shall pay the costs. As part of their costs, if they have not already done so, Defendants shall pay an expert witness fee to the deponents, the amounts of which were set in Orders previously filed by Deputy Commissioner Harris.
This the ___ day of March, 2011.
 S/___________________
 LINDA CHEATHAM
 COMMISSIONER
CONCURRING:
S/_______________
BERNADINE S. BALLANCE
COMMISSIONER
S/_______________
LAURA KRANIFELD MAVRETIC
COMMISSIONER *Page 1